STANDARD SEWING MACH. CO. OF OHIO v. JONES.

(Circuit Court of Appeals, Third Circuit. August 11, 1919.)

No. 2428.

1. PATENTS ⬥216—LICENSES—CONSTRUCTION OF CONTRACT.

A contract by which a manufacturer of sewing machines granted the exclusive right to sell its machines on commission in a specified territory, which contained no reference to a patent on the machines, *held* not a contract of license, but one of agency, which did not give the manufacturer a right of action for infringement on account of sales by the agent outside of his territory.

2. PRINCIPAL AND AGENT ⬥81(4)—AGENCY TO SELL ON COMMISSION—SUIT FOR COMMISSIONS.

Under a contract by which complainant was given exclusive right to sell sewing machines made by defendant on commission in a specified territory, and in which he agreed during the term not to sell or deal in any machines made or sold by any other concern, a sale by him of machines made by defendant outside of his territory, whether the property of defendant or another, was a breach of his contract, and he is not entitled to commissions on such sales.

Appeal from the District Court of the United States for the Western District of Pennsylvania; W. H. S. Thomson, Judge.

Suit in equity by Simeon M. Jones against the Standard Sewing Machine Company of Ohio. Decree for complainant, and defendant appeals. Modified and affirmed.

Sion B. Smith, of Pittsburgh, Pa., for appellant.
Ed. B. Scull, of Pittsburgh, Pa., for appellee.

Before WOOLLEY, Circuit Judge, and HAIGHT and MORRIS, District Judges.

WOOLLEY, Circuit Judge. In 1905, Jones, the plaintiff below, entered into a written contract with the Standard Sewing Machine Company of Ohio, the defendant below, whereby he was given the exclusive right to sell on commission, in a specified territory, sewing machines of that company's manufacture. The territory covered by the

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

contract included inter alia the State of West Virginia. It did not include the cities of Pittsburgh and Philadelphia.

The contract was extended by renewals to March 31, 1910, on which date it expired by its own limitation.

In 1908, the Standard Company, with the acquiescence of Jones, entered into a contract with Lloyd Souders & Company, a copartnership, giving that firm the exclusive right to sell its machines in the State of West Virginia. This contract is similar in its main features to the contract with Jones, but differs from it in. two particulars, first, in restricting the exclusive territory to the State of West Virginia, and, second, in requiring that firm to sell within the term of the contract "or to purchase for their own account 500 Standard machines." In return for relinquishing West Virginia as a part of his exclusive territory, the Standard Company undertook by an oral agreement to pay Jones two dollars on each machine which Souders & Company sold or purchased under their contract.

This contract, like the one with Jones, was extended by renewal to March 31, 1910.

In June, 1910, Jones brought this action against the Standard Company for an accounting and for the recovery of commissions earned and withheld from him for machines sold under the written contract, although evidence was admitted and the case was tried as though he had declared on the oral contract also. By its answer, the Standard Company traversed all material allegations in the bill, and, by cross-bill, brought a counter-action against Jones for damages, based on facts, which, in so far as they are not disputed, are as follows: By the first of the year, 1910, Souders & Company had sold but 190 of the 500 machines they had undertaken to sell or purchase within the term of their contract. It was evident they could not sell the remaining 310 machines before the contract would expire on March 31, following. Souders & Company were anxious to be released from their contract and the Standard Company was disposed to accede to their desire. But Jones, who had surrendered his West Virginia territory to Souders & Company in consideration of a commission of two dollars a machine payable by the Standard Company, on the contract number of 500 machines, insisted, for obvious reasons, that the Standard Company enforce the contract. The Standard Company thereupon demanded of Souders & Company the performance of their contract. This placed Souders & Company in a difficult position, for they could not sell the machines in the few remaining months of the contract, and, being without funds, they could not purchase them for their own account. Jones came to their rescue, and on his representation that he could sell the machines for them in the East, Souders & Company set about to purchase them. But this was fraught with difficulties, both legal and financial. Jones still was the agent of the Standard Company with exclusive territory that did not embrace the East. The sale of Standard machines by him outside of his territory, while his contract was in force, suggested, at last, a breach of his contract. The Standard Company would not sell Souders & Company this large number of machines unless they paid for them on delivery. Souders &

Company were without funds to meet this requirement. To perform their contract Souders & Company had to borrow money. To get money, they entered into negotiations with Highland, a local banker, and obtained from him a promise to advance money to pay for the machines on the presentation of bills-of-lading. But Highland imposed as a condition of his money advances that he first be shown orders for the resale of the machines.

To meet the conflicting requirements of this circuitous transaction, the resale of the machines, evidenced by written orders, was a primary essential. To effect this, Jones began negotiations with Spear & Company in Pittsburgh and Gimbel Bros., in Philadelphia for the purchase of the 310 machines which Souders & Company were bound to take under their contract. These negotiations, indisputably commenced by Jones in February or March when under contract with the Standard Company, were completed by him in March, with his contract still in force, or in April, after his contract had expired, according as the conflicting testimony on this disputed point is believed. Spear & Company at Pittsburgh ordered and received 80 machines and Gimbel Bros. at Philadelphia ordered and received 230 machines.

In the territory of one or both of these transactions, the Standard Company had agents under similar contracts for exclusive territory, the agent in Philadelphia being John Wanamaker. When Gimbel Bros. put the Standard machines purchased through Jones on sale at cut rates, the Standard Company was forced to protect its contract with Wanamaker by taking the machines off the market. To do this, it purchased the machines from Gimbel Bros. (and likewise from Spear & Company) at prices and under an expense that caused it a loss. The Standard Company then brought the counter-action against Jones by its cross-bill in this case, whereby it seeks several recoveries on one ground. It alleges that Standard machines, the subject matter of its contracts with Jones and Souders & Company, were patented machines; that these contracts for the sale of patented machines were, therefore, patent licenses; and that Jones, in selling the machines outside of his exclusive territory, exceeded his license and infringed the patent. By the prayers of the cross-bill, the Standard Company asks for a decree finding infringement; ordering a disclosure of all sales made; directing an accounting for profits; and finally, awarding (1) damages for the infringement, and (2) "all damages * * * arising out of his (Jones') breach of contract as aforesaid."

The District Court allowed Jones commissions, inter alia, on these sales and disallowed damages to the Standard Company. The Standard Company appealed.

The confusion in this case will disappear when the true character of the contracts with Jones and with Souders & Company is determined and if the two contracts are kept separate and distinct throughout the discussion.

[1] The Standard Company maintains that, under a proper construction, both contracts are license agreements. This contention is based on the single fact that the subject matter of the contracts is (in part) patented articles, namely, sewing machines manufactured

under a patent. There is nothing in the contracts to suggest that they are license agreements beyond the circumstance that a part of their subject matter is patented articles. They contain no reference to the patent under which the machines were made and no reference to the machines as patented articles. The silence of the contracts on the subject of patents, patent rights, licenses and royalties, leads us to believe that it did not occur to the parties, or to any one of them, that they were entering into license agreements. If these contracts are to be construed as license agreements, it can only be upon the bald fact that a part of the articles covered by the contracts were patented, and that too, without regard to whether that fact was known to both parties. We are not familiar with any law that raises an agreement of license by implication from the single fact that the subject matter of the contract is patented. The minds of contracting parties must meet in a license agreement just as in any other agreement. Whatever may be their real nature, the contracts, manifestly, are not agreements to share in a patent monopoly.

True, five years after the original contract had been made with Jones, and on the eve of the expiration of both contracts, the Standard Company endeavored by correspondence to impress upon the two contracts the character of license agreements by claiming a patentee's control over the sale of the patented articles. But the character of a contract cannot be changed or its terms be varied by an interpretation asserted by one party and not acquiesced in by the other months after the contract has been made and in part performed. To be a contract of license, it had to be such when it was made, or it is not a contract of license at all. We are satisfied that the contracts in this case are not license agreements; and, in consequence, there is not involved in this case the law of patents. It follows, therefore, that the District Court was right in reversing the master's finding of infringement and his allowance of damages for infringement.

Not being license agreements, what are the two contracts? It is very clear that they are simple contracts of agency, whereby the agents, though given an exclusive right to sell the principal's articles of manufacture in their respectively specified territories, are restricted in their sales to those territories. This construction is applicable alike to both contracts, in so far as they involve sales on commission. We are not presently concerned with a construction of the contract with Souders & Company for the purchase of machines for their own account.

[2] Turning to the Jones contract, Jones contends that the award of exclusive territory to him was for his advantage alone; that it was intended only to protect him against competition in the sale of the same articles in his territory; and, that, the contract being in this sense unilateral, he was free to go everywhere else and sell the articles of his principal in competition with his principal's other agents. We do not regard this contention as sound. Manifestly, the contract involves mutuality and imposes upon the agent, in consideration of the exclusive territory granted him, the duty to limit his activities to that territory. This interpretation applies equally to

the exclusive territory features of both contracts in so far as they relate to the sale of machines on commission.

It is conceivable that another aspect of the case can arise with reference to that part of the contract with Souders & Company which required them to purchase for their own account all of the 500 machines they had not sold on commission. But this phase of the contract would require consideration only if it were found that Jones and Souders & Company had disposed of the machines after the expiration of their respective contracts on March 31, 1910, and also, if this were an action by the Standard Company against Souders & Company, instead of being, as it is, a counter-action against Jones. We shall, therefore, address our discussion solely to the Jones contract and to the liability of the parties therein one to the other.

The question of liability growing out of the Jones contract revolves around the thirty-first day of March, 1910, the date of its expiration. If the Standard Company sold Souders & Company the 310 machines after its written contract with Jones had ended, whatever may be Jones' rights under his oral contract with the Standard Company, he cannot recover commissions on that sale. If Jones sold Souders & Company's 310 machines to Spear & Company and Gimbel Bros., after March 31, 1910, that is, after his contract of agency had ended, he cannot be called upon by the Standard Company to respond in damages for a breach of an expired contract. After March 31, all contractual relations between the Standard Company and Jones ceased and neither was liable to the other for commissions or in damages for acts that followed. If the two sales were made before March 31, 1910, that is, when both contracts were in force, an altogether different situation is presented, entailing different legal consequences. The central question of fact, therefore, is, when were the sales made?

Just the precise date on which the sales were made does not appear in the testimony. There is evidence by the purchasing agent of Gimbel Bros. that negotiations were begun by Jones in the latter part of February or the early part of March and that, acting for Gimbel Bros., he gave Jones an order for the machines in the latter part of March. It is not disputed that Souders & Company ordered the machines of the Standard Company on March 15th. Highland, the banker, testified that he financed the "sewing machine deal about March, 1910," negotiations for which were begun by Souders & Company "in the early part of the year," and that the condition precedent to his money advances was the resale of the machines. The machines were delivered to Souders & Company and thence transshipped to Spear & Company and Gimbel Bros. on different dates in April and May. On this evidence, very briefly recited, we are forced to a finding opposite to that of the learned trial judge. As we read the evidence, it appears to us that the sale of the machines by the Standard Company to Souders & Company and the sales by Souders & Company through Jones to Spear & Company and to Gimbel Bros. were made in March while Jones' contract with the Standard Company still was in force, though deliveries on the several sales were not made until after the contracts had expired.

It is contended by Jones that, if this be true, any breach of contract here involved must have been a breach by Souders & Company of their contract and could not have been a breach by him of his contract, because the machines sold in Pittsburgh and Philadelphia were Souders & Company's machines and the sales were made by Souders & Company in violation of the exclusive territory provision of their contract and not of his contract. In proof of this he urges, that there could not have been two contracts with West Virginia as exclusive territory. We are not impressed by this contention because Jones is not charged with violating his contract by selling outside of his surrendered territory of West Virginia. He is charged with violating his contract by selling outside of the exclusive territory that remained to him after he had surrendered West Virginia to Souders & Company. He sold Standard machines and he sold them outside of his territory. The test of his liability for doing this, when his contract still was in force, is the ownership of the machines he sold. Who owned them? If the Standard Company, Jones violated his contract of agency by disregarding the fiduciary relation between himself and his principal and by violating the rule of good faith and loyalty which that relation imposes. If Jones sold machines of his principal outside the territory to which he was restricted, manifestly he can not recover commissions for their sale. Were the machines, when sold by Jones to Spear & Company and Gimbel Bros., the property of Souders & Company? Jones says they were, and on their ownership he bases his case. If this be true—and we regard it as true on Jones' concession only for the purpose of discussion—then we find, by referring to the contract, that Jones clearly committed a breach of his written contract which bars him from receiving commission on the sale to Souders & Company under his related oral contract. The contract provides that:

"Party of the second part [Jones] agrees that *during the life of this contract he will not sell or deal in, directly or indirectly,* sewing machines or machine merchandise manufactured or *sold* by any other concern than the party of the first part" [The Standard Company].

Now, what Jones did "during the life of this contract" was "directly" to "sell (and) deal in" sewing machines "sold by (another) concern." The other concern was Souders & Company. Jones sold their machines to Spear & Company and Gimbel Bros., as we find, during the life of the contract. In doing this, he committed a breach of this express provision. Certainly he is not entitled to commissions on sales involved in that breach.

Finding that Jones committed a breach of his contract during its life, by selling outside of his territory, Standard machines which were the property either of the Standard Company or of Souders & Company, we are constrained to reverse that part of the decree of the court below allowing commissions on the sale of these machines and interest on these commissions.

But this breach of the contract by Jones does not deprive him of a right to recover in this action commissions earned on previous sales

and withheld from him, unless, indeed, such recovery is barred, in whole or in part, by a counterclaim of the Standard Company for damages arising from Jones' breach of the contract, as a contract of agency, not as a license agreement. On this matter we express no opinion, as it is not raised by the appeal.

It is clear, however, that the damages awarded the Standard Company by the Master and disallowed by the District Court were based not on a breach of the contract as a contract of agency but on a breach of the contract as a license agreement. Therefore, in formulating a decree on this appeal, we could not—even were we so disposed—direct that the damages found for infringement shall be awarded the Standard Company as damages for the breach of the contract of agency. Nor are we satisfied that, under the pleadings in this case as they stand, damages for the breach of his contract of agency could be proved against Jones and allowed the Standard Company, because the damages the Standard Company seek by its cross-bill are such as arise only from infringement; except, it may be, as to one prayer, which is as follows:

"That the said defendant Jones be required to pay all damages to plaintiff arising out of his breach of contract as aforesaid."

This is a prayer to a cross-bill which sets up the contract and alleges the breach. The prayer as made is poor pleading in that the orator leaves the court to guess its meaning. But for the words "as aforesaid," the prayer might be construed to ask for damages for the breach of the contract whatever its character; but by the use of these words in referring to the breach of contract, we are forced to the conclusion that the breach so referred to is the breach of a contract which the orator interpreted in its cross-bill as a contract of license. As we read the bill, we find no charge of a breach of the contract of agency, and no prayer for damages arising therefrom.

We have given the remaining assignments of error careful consideration and find no errors. We affirm the decree of the court below except in the one matter in which we have indicated reversal. We leave with the trial court the fixation of all costs incurred and to be incurred in the trial, and impose the costs of this appeal upon the appellant and the appellee in equal proportions.